**In the Matter of William B. KESSLER, Debtor.**

**Bankruptcy No. 80 B 11966 (EJR).**

United States Bankruptcy Court, S. D. New York.

Oct. 19, 1982.

Levin & Weintraub, New York City, for debtor.

Solomon, Rosenbaum, Drechsler & Leff, New York City, for Amalgamated Ins. Fund; Marcus, Leitner, Greene and Preefer, P.C., New York City, of counsel.

Robert Bach, Associate Gen. Counsel, New York City, for Amalgamated Clothing and Textile Workers Union.

DECISION ON OBJECTION TO CLAIM

EDWARD J. RYAN, Bankruptcy Judge.

William B. Kessler, Inc. ("Kessler"), filed a petition under Chapter 11 of the Bankruptcy Code on November 21, 1980. Prior to the filing of the bankruptcy petition, Kessler was engaged in the manufacture of clothing.

Kessler was a party to two collective bargaining agreements. On June 1, 1977, Kessler executed a collective bargaining agreement with the South Jersey Board of the Amalgamated Clothing and Textile Workers Union; and, on October 1, 1980, a national agreement between the Clothing Manufacturers Association of the United States of America, of which Kessler is a member, and the Amalgamated Clothing and Textile Workers Union was executed as a supplemental agreement.[1]

Provisions of the collective bargaining agreements provided, *inter alia,* that Kessler participate in a Multi-employer Pension Plan ("MPP") established pursuant to the Multi-employer Pension Plan Amendments Act of 1980 ("MPPA"). According to the terms of the agreements, the participating employer had to make contributions to the Union, thereby providing the Union with retirement funds and social insurance funds for distribution as pension funds to each employee of each participating employer. Upon receipt of contributions by a participating employer, the Union was to consolidate same with all other funds paid into the MPP. The employee was to receive his pension from this consolidated fund. Each employee, therefore, receives his pension from a consolidated fund, not directly from his own employer.

Another provision of the collective bargaining agreements provides that upon cessation of an employer's operations and the termination of its employees, a withdrawal liability shall be due and owing from such

---

1. The abovementioned agreements shall be referred to as "the collective bargaining agreements." The South Jersey Joint Board of the Amalgamated Clothing and Textile Workers Union and the Amalgamated Clothing and Textile Workers Union, parties to the abovementioned agreements, shall be jointly referred to as "the Union."

employer to the Union. The purpose of the withdrawal liability is to insure that there will be adequate funds for the payment of pensions to employees benefitting from the MPPA. Upon payment of the withdrawal liability, the Union thereafter consolidates same with the abovementioned consolidated fund from which the Union makes pension fund disbursements.

In May, 1981, the Union filed a proof of claim entitled "Proof of Claim for Contributions to an Employee Benefit Plan," wherein the Union claimed that Kessler owed a withdrawal liability to the Union in the amount of $4,537,761.09; the Union demanded priority to the extent permitted by U.S.C. § 507(a)(3) and (4). Thereafter, on February 1, 1982, the court entered an order for reclassification of the Union's priority claim for withdrawal liability as a general unsecured claim. On August 3, 1981, the Union filed a proof of claim entitled an "Administration Claim for Contributions to an Employee Benefit Plan," wherein the Union claimed that Kessler owed a withdrawal liability in the amount of $4,464,-957.06. On December 28, 1981, the Union filed a proof of claim entitled "Amended Administration Claim for Contributions to an Employee Benefit Plan," wherein the Union claimed Kessler owed unpaid contributions to the MPP in the amount of $17,-613.38 and withdrawal liability in the amount of $4,347,640.19. The claim for unpaid contributions in the amount of $17,-613.38 has been paid, thereby leaving a claim in the amount of $4,347,640.19

Kessler filed an Objection to Claim on February 22, 1982, wherein Kessler (a) moved this court for an order expunging the May, 1981 and the August, 1981 claims on the ground that they are duplicative of the claim filed on December 28, 1981, and (b) moved this court for a reclassification of

the December 28, 1981 claim as a general, unsecured claim on the ground that the part of the claim that refers to the debtor's obligation for withdrawal liability is not entitled to administration status under 11 U.S.C. § 507(a)(1).

There being no dispute with respect to the facts of this case, a determination is appropriate on the issue of whether a claim for a debtor's withdrawal liability under the MPPA is entitled to administration status pursuant to § 507(a)(1) of the Bankruptcy Code.[2]

■ In support of its position that the Union's claim for withdrawal liability under the MPPA is not entitled to administrative status pursuant to § 507(a)(1) of the Bankruptcy Code, Kessler correctly argues that the thrust of §§ 507(a)(1) and 503(b)(1)(A) is to give first level priority status to those expenses incurred after the commencement of the bankruptcy proceedings which aid in preserving the estate for the benefit of all creditors. *In re Meyer's, Inc.*, 15 B.R. 390, 5 C.B.C.2d 678 (Bkrtcy.S.D.Calif.1981); 3 *Collier on Bankruptcy* (15th ed. 1981) ¶ 503.-04(1)(a). The amount of the claim for withdrawal liability herein is based upon employees' services rendered prior to the commencement of the bankruptcy proceedings. In addition, the determination of the withdrawal liability is calculated using factors predicated on pre-petition services. Furthermore, claims for an allowance as administrative expenses are to be judged by the actual value received by the estate; thus, a claim which merely has the potential for value upon the happening of other events may not be allowed as an administrative expense. *In re Rhymes, Inc.*, 14 B.R. 807, 5 CBC 2d 478 (Bkrtcy.D.Conn.1981). While the cessation of Kessler's business opera-

**2.** § 507. Priorities

(a) The following expenses and claims have priority in the following order:
(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under Chapter 123 of title 28.
§ 503. Allowance of administrative expenses.

(b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—
(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case; ....

tions and termination of its employees may serve to preserve the estate for the benefit of all creditors, no actual value is received by the estate such as would warrant administrative status. Rather, the estate has merely retained funds which it already possessed.

■ Kessler also cites the general rule that the broad purpose underlying the bankruptcy law is to bring about an equitable distribution of the debtor's estate to its creditors. *Kothe v. R.C. Taylor Trust,* 280 U.S. 224, 50 S.Ct. 142, 74 L.Ed. 382 (1930); *Standard Oil Company v. Kurtz,* 330 F.2d 178 (8th Cir. 1964), *Nathanson v. N.L.R.B.,* 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952). A priority, therefore, should arise clearly from the statute.

■ Congress did not intend to include an employer's obligation for withdrawal liability within the priority provisions set forth in § 507(a)(1). Rather, an employer's obligation for withdrawal liability was established so as to encourage the growth of multi-employer pension plans and prevent the collapse of such plans due to an employer's withdrawal from said plans. 29 U.S.C. § 1001a. This being the stated purpose of the MPPA, equity requires a marshalling of as many assets as possible for distribution to unsecured claimants.

■ The Union's position that its claim of withdrawal liability is an administrative expense pursuant to § 507(a)(1) rests upon the Union's contentions that (a) the withdrawal liability did not accrue until after the commencement of the bankruptcy proceedings, (b) a proper statutory construction of 11 U.S.C. § 503 includes the above-mentioned claim for withdrawal liability in the classification of "administrative expenses", and (c) the claim for withdrawal liability is an expense incident to the preservation of the estate. The Union bases its contention that the withdrawal liability did not accrue until after the commencement of the bankruptcy proceedings on the fact that the withdrawal liability, in accordance with the terms of the collective bargaining agreements, did not become due and owing to the Union until Kessler ceased the operations of its business. Had Kessler continued its business operations, no such withdrawal liability would now exist. However, as discussed earlier, the calculation of withdrawal liability, though triggered post-petition, is based entirely on pre-petition factors.

With respect to the statutory construction of § 503, the Union argues that pension funds are analogous to "commissions" for services rendered; and, that in accordance with the legislative intent of 11 U.S.C. § 503, the Union's claim for withdrawal liability deserves the classification of an administrative expense.

The Union relies on the case of *Straus-Duparquet, Inc. v. Local U. No. 3 Int. Bro. of Elec. Wkrs,* 386.F.2d 649 (1967), wherein the United States Court of Appeals for the Second Circuit held that claims for severance pay are entitled to be classified as administrative expenses in their entirety, while claims for vacation pay are to be classified as administration expenses with respect to only that portion of the vacation pay which accrued subsequent to the filing of the bankruptcy petition.

*Straus-Duparquet* involved claimants who were represented in collective bargaining by the Union and were employed by the debtor for some time prior to the commencement of the debtor's bankruptcy proceedings. During the Chapter 11 proceedings, the debtor in possession discharged the claimants. The union filed a claim in their behalf for vacation pay and severance pay under the collective bargaining agreement between the union and the debtor. The issue was whether the claims were entitled to priority under Section 64(a)(1) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1), as expenses of administration of the bankrupt.[3] The court found that vacation pay is generally regarded as earned from day to day over the period of a year intervening between vacations and that therefore, only that amount accrued post petition is enti-

**3.** The analogous provisions of the Bankruptcy Code—§ 507 and § 503—are substantially the same; the changes have no relevance to the issue herein decided.

tled to priority. The court distinguished severance pay from vacation pay with respect to the date of accrual. Severance pay is not earned from day to day. After the period of eligibility is served, the full severance pay is due whenever termination of employment occurs. The court cited *Adams v. Jersey Central Power & Light Co.,* 21 N.J. 8, 13–14, 120 A.2d 737, 740 (1956), for its definition of severance pay as "... a form of compensation for termination of the employment relation[ship] ...." Consequently, the court held that severance pay is an expense of administration.

The Union herein argues that withdrawal liability, like severance pay, is compensation to the employees for the termination of the employment relationship and, as post-petition compensation, is entitled to administrative status.

However, the Union misses the obvious distinction between severance pay and withdrawal liability. Severance pay is direct compensation to an employee who works post petition and whose employment is nevertheless terminated. Such an employee has contributed to the preservation of the estate by working post petition. He is therefore entitled to the full benefits flowing directly from his employment. One such direct benefit which comes due upon termination of employment is severance pay.

Withdrawal liability, however, is not direct compensation to an employee for termination of his post-petition employment relationship with the debtor in possession. Rather, the withdrawal liability is an obligation of the debtor to the Multi-employer Pension Fund pursuant to the MPPA. Although the employee and other union employees might benefit from the contribution, the liability is not a direct payment to an employee for his post-petition services. Therefore, withdrawal liability, unlike severance, is not entitled to administrative status.

For all of the foregoing reasons, the objection to the Union's claim is sustained; the claims of May 1981 and August 1981 are expunged and the claim dated December 28, 1981, is to be reclassified as a general unsecured claim.

Settle an appropriate order.